UNITED STATES of America

v.

**Frederick C. PRIOR.**

**No. 74–117–CR–T–H.**

United States District Court,
M. D. Florida,
Tampa Division.

Aug. 30, 1974.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Anthony LaSpada, Asst. U. S. Atty., Tampa, Fla., for plaintiff.

Robert L. Floyd and James D. Little, of Frates, Floyd, Pearson, Stewart, Proenza & Richman, P. A., Miami, Fla., for defendant.

## ORDER ON MOTION TO SUPPRESS

HODGES, District Judge.

The Defendant has filed a motion to suppress which presents a novel and important issue. Yet, despite its novelty, recent decisions lead inexorably to one resolution. The motion must be granted.

The Defendant is a lawyer who resides and practices in West Palm Beach. On April 30, 1974, a Tuesday, he was served with a subpoena duces tecum commanding his appearance before the Grand Jury of this Court sitting in Tampa. The subpoena was returnable on the following Friday, May 3, 1974. Upon being served the Defendant telephoned the Assistant United States Attorney, whose name appeared on the process, and requested a brief reprieve so that he would have more time to accumulate and produce the necessary documents. He also inquired as to the subject of the investigation. The Assistant United States Attorney declined to defer the return date but assured the Defendant

that he was not a "target" of the investigation, that he was merely a "third-party" witness, and that he should appear as directed.

Accordingly, without benefit of counsel, Defendant duly reported in response to the subpoena on Friday, May 3, 1974. He appeared briefly before the Grand Jury during the morning, surrendered the subpoenaed papers, and was asked to abide the Jury's pleasure while it reviewed the documents. He was not called again that day but was directed to return the following Monday, May 6.

On Monday, May 6, and again on Tuesday, May 7, the Defendant was examined and testified at length before the Grand Jury. It is appropriate at this point to jump ahead in the chronology of events in order to quote from the pending indictment concerning the nature of the Jury's investigation. Paragraphs 2 and 3 of Count Two allege:

"2. At the time and place aforesaid, the Grand Jury was conducting an investigation to determine whether violations of the Internal Revenue Laws of the United States and other criminal statutes of the United States had been committed in the Middle District of Florida."

"3. It was material to the aforesaid investigation to determine whether Fred O. Dickinson, Jr. received moneys which represented his share of the proceeds from the sale of stock in the Palm Beach Mall Bank."

Paragraphs 2 and 3 of Count Three allege:

"2. At the times and place aforesaid, the Grand Jury was conducting an investigation to determine whether violations of the Internal Revenue Laws of the United States and other criminal statutes of the United States had been committed in the Middle District of Florida."

"3. It was material to the aforesaid investigation to determine wheth-

er the services described in a work statement bill submitted on December 4, 1969, by Frederick C. Prior to the Commercial Bank of Winter Park and to the attention of E. G. Banks had in fact been performed."

At one point about midway through the Defendant's testimony on Tuesday, May 7, the following occurred:

"Q. Now, what did you do? What kind of conferences and consultations did you have in a representative capacity with the Commercial Bank of Winter Park December of 1969?

A. I can't recall.

Q. Mr. Prior, you're under oath. Mr. Foreman, would you read Section—

Mr. Foreman: Mr. Prior, this is Section 1623, False Declarations Before Grand Jury or Court. [The Foreman then read 18 USCA § 1623(a)].

Q. [By the Assistant United States Attorney] Do you understand that Mr. Prior?

A. I do.

Q. Now, Mr. Prior, I'm asking you again . . ."

A short while later, this exchange transpired:

"Q. But Mr. Prior, you're an attorney, correct?

A. Yes, sir, I hope.

Q. You understand the functions of the Federal Grand Jury, do you not?

A. No, sir, not really.

Q. Well, you do understand you're giving testimony before this Federal Grand Jury and this Federal Grand Jury is conducting an investigation. Now, without getting into all of the facts concerning the investigation, you realize that you have been called as a witness, you have taken an oath, a solemn oath?

A. Yes, sir.

Q. We're asking you questions and asking you to tell us the truth, you understand that?

A. Yes, sir.

Q. And the Foreman has read a Statute relating to perjury and what effect the telling of a misstatement or untruth to this Grand Jury has, you understand that, don't you?

A. Yes, sir."

At the end of the day—Tuesday, May 7—the Defendant was excused, subject to recall. Two weeks later, on May 21, he was again served with a subpoena duces tecum requiring his reappearance before the Grand Jury on Monday, June 3, 1974. On this occasion the proceedings were opened by the United States Attorney:

"BY MR. BRIGGS [The United States Attorney]:

Q. Mr. Prior, first of all, state your full name.

A. Frederick C. Prior, also known as Ted.

Q. Mr. Prior, you are the same Mr. Prior that has previously appeared before this Grand Jury, have you not?

A. Yes.

Q. Prior to asking you any questions, Mr. Prior, I might say that we have reviewed some of the testimony that you have previously given. *There is some concern concerning some of the testimony* and for that reason, in addition to the extra questions that we will be asking on other matters today, *we are going to rephrase some of the questions that we asked previously on the chance that we may have been unclear on those questions.*

Do you understand, sir?

A. I guess I do.

BY MR. LA SPADA [Assistant United States Attorney]:

Q. Do you understand, Mr. Prior?

A. I guess I do. You are going to ask me some more questions?" (Emphasis supplied)

The Defendant was then interrogated again with respect to many of the same matters about which he had been questioned during his previous appearances on May 6 and 7. He was excused at noon. Less than three days later, on Thursday, June 6, 1974, the instant indictment was returned charging the Defendant with seven counts of perjury under 18 U.S.C. A. § 1623. Counts One and Five allege questions and answers given on June 3. Counts Six and Seven allege questions and answers given on May 7. Counts Two, Three and Four each allege questions and answers given on May 7 *and* June 3.

It is undisputed that the Defendant was never given a *Miranda* [1] caution or warning concerning his Fifth and Sixth Amendment rights at any time before or during his testimony to the Grand Jury; and the Defendant has asserted without contradiction that he never consulted counsel until after he had been indicted.

■ The factual trigger which activates an individual's Fifth and Sixth Amendment rights, including the right to be informed of those safeguards, was defined by the Supreme Court in *Miranda* as being that point in time ". . . when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way. It is at this point that our adversary system of criminal proceedings commences . . ." 384 U.S. at 477, 86 S.Ct. at 1629. Scores of decisions since *Miranda* have predictably involved the issue as to what constitutes "custodial interrogation" or its equivalent. In United States v. Montos, 421 F.2d 215,

---

1. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965).

223 (5th Cir. 1970), our Circuit Court stated:

"Where the line between 'general investigation' and 'custodial interrogation' is crossed is not capable of precise demarcation. Each case will turn upon its own particular facts. Therefore, we continue to follow a case-by-case approach in this area to foster proper development of controlling precedent. Agius v. United States, 5 Cir., 1969, 413 F.2d 915, 918. Courts have employed various criteria in determining when an individual's right to the *Miranda* warnings arises. These criteria include probable cause to arrest, subjective intent of the police, subjective belief of the defendant, and focus of the investigation. No single criterion is necessarily decisive. Instead, each case must be examined to determine whether there were present the compulsive factors with which *Miranda* was concerned."

The following year, in United States v. Phelps, 443 F.2d 246, 247–248, (5th Cir. 1971), the Court ventured a little farther:

"In *Miranda* the Court said that it meant by the term custodial interrogation 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way.' 384 U.S. at 444, 86 S. Ct. at 1612. In subsequent cases in this circuit, when called upon to further elucidate this concept, our court has consistently refused to formulate a general rule to distinguish custodial from non-custodial interrogations. Instead, we have deliberately followed a case-by-case approach. See United States v. Akin, 5 Cir. 1970, 435 F.2d 1011; United States v. Montos, 5 Cir. 1970, 421 F.2d 215. Nevertheless, piecing together the cases in this court and others, some things have become clear. For example, it is now certain that the mere fact that interrogation takes place in the familiar surroundings of the defendant's home or place of business rather than in the police station does not necessarily mean the defendant is not being subjected to custodial interrogation. Orozco v. Texas, 1969, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311. Nor must the defendant be under formal arrest prior to the interrogation in order for *Miranda* rights to arise. Windsor v. United States, 5 Cir. 1968, 389 F.2d 530. On the positive side, we have noted several significant factors which should be considered in determining whether or not a defendant is in custody. For example, probable cause to arrest, subjective intent of the police, focus of the investigation, and subjective belief of the defendant have all been deemed relevant. United States v. Montos, *supra*. However, throughout the decisions one of these factors has consistently impressed our court: whether or not the focus of the investigation has finally centered on the defendant. In *Miranda* itself the Supreme Court explained that 'in custody' was a short-hand phrase for what Escobedo v. Illinois, 1964, 378 U.S. 478, 490, 84 S.Ct. 1758, 12 L.Ed.2d 977, described as an investigation which has focused on an accused."

■ Inevitably, therefore, the question was bound to arise as to whether, or when, and under what circumstances *Miranda* applies to witnesses subpoenaed before a Grand Jury. In Mattox v. Carson, 424 F.2d 202 (5th Cir. 1970), cert. denied, 400 U.S. 822, 91 S.Ct. 43, 27 L.Ed.2d 51 (1971), and in United States v. Morado, 454 F.2d 167 (5th Cir. 1972), the Court recognized the problem, alluded to the fact that the Sixth Circuit had applied *Miranda* to Grand Jury witnesses who had become "virtual" or "putative" defendants, but found it unnecessary to decide the issue in those cases. Within the past sixty days, however, the Court met the question head-on in United States v. Mandujano, 496 F.2d 1050, and United States v. Rangel, 496 F.2d 1059

(5th Cir. 1974).[2] In those cases an undercover officer had made investigative reports identifying the Defendants, respectively, as persons believed to be engaged in buying and selling heroin. They were subpoenaed before the Grand Jury and, absent a full *Miranda* warning, were questioned about these activities. Each denied involvement in any illegal transaction, and each was promptly indicted on two counts—the first count charging the substantive offense of having violated the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C.A. § 841 et seq.), and the second count charging perjury under 18 U.S.C.A. § 1623 for giving false testimony to the Grand Jury when questioned about the very offense alleged in count one. The District Court found, as a fact, that the Government had "one eye on a possible prosecution of the defendants" at the time they were subpoenaed before the Grand Jury, and that, considering the totality of the circumstances, their interrogation before the Grand Jury "smack[ed] of entrapment." See, 365 F.Supp. 155, at 158. The Court then proceeded to suppress the Grand Jury testimony, applying the Sixth Circuit rule that the posture of the accused as "putative" or "virtual" defendants at the time of their appearance was the equivalent of *Miranda's* "custodial interrogation," and that each was entitled to the full warning prescribed by that decision. The Court of Appeals has now affirmed, and it is thus established, in some circumstances at least, that *Miranda* can and should be applied to Grand Jury proceedings. That principle, however, necessarily serves to create an entirely new set of issues, particularly in prosecutions for perjury.

■ It has always been the law that a witness is not entitled to assert the privilege against self-incrimination on the ground that if he testifies he will perjure himself. The Fifth Amendment right to remain silent relates to past events and does not endow the witness with a license to commit perjury in answering questions not yet asked. He may refuse to answer, of course, if a truthful response might incriminate with respect to *other* offenses already committed or then in progress, but he will not be heard to say that he intends to lie, and that he may therefore claim the privilege on the theory that once he has perjured himself he would then be subject to prosecution for *that* offense. Any other rule, of course, would extend the Fifth Amendment so far beyond its intended purpose and scope as to make a mockery of the judicial process. It would become a sword, not a shield, and would utterly frustrate the power of subpoena as against any witness willing to declare an intention to perjure himself. See Glickstein v. United States, 222 U.S. 139, 32 S.Ct. 71, 56 L.Ed. 128 (1952).

In the frequently cited opinion of this Circuit in United States v. Orta, 253 F.2d 312, 314 (5th Cir. 1958), cert. denied, 357 U.S. 905, 78 S.Ct. 1149, 2 L.Ed. 2d 1156 (1958), the Court quoted with approval the rule of the Second Circuit as follows:

"In United States v. Scully, 2 Cir., 1955, 225 F.2d 113, 116, the Court of Appeals for the Second Circuit held:

'* * * the mere possibility that the witness may later be indicted furnishes no basis for requiring that he be advised of his rights under the Fifth Amendment, when summoned to give testimony before a Grand Jury.' "

*Orta,* of course, was a pre-*Miranda* decision, but its continuing vitality has been repeatedly reaffirmed. See, Stassi v. United States, 401 F.2d 259 (5th Cir. 1968); United States v. Wilcox, 450 F.2d 1131 (5th Cir. 1971); United States v. Daniels, 461 F.2d 1076 (5th Cir. 1972);

2. Upon telephonic inquiry of the Clerk in New Orleans, the Court has been advised that petition for rehearing and petition for rehearing en banc have been filed and not yet determined.

and United States v. Glasco, 488 F.2d 1068 (5th Cir. 1974).

Thus, in its recent *Mandujano* and *Rangel* opinions, the Court took pains to distinguish *Orta* and its progeny, and to preserve *Orta's* indispensable rationale as the governing rule in the great majority of cases involving what the Court called "ordinary" witnesses.

"We reiterate that the *Orta* principle that witnesses uninformed of their constitutional rights should not be allowed a license to commit perjury continues with full force. We only make a slight inroad that where a totally unfair procedure is put in train—as when there is a factual determination that a person who is subpoenaed before the grand jury and questioned about an alleged crime, was already known to the satisfaction of the prosecuting agency prior to the grand jury appearance to be guilty of that precise crime—, elemental fairness requires that such a person is under such compulsion as to require that he be given the *Miranda* warnings, and that failure to do so must require suppression of any incriminating testimony given by him even though he is being prosecuted for giving false testimony." United States v. Mandujano, 496 F.2d 1050, 1058 (5th Cir. 1974).

The Government in this case insists that *Orta* is controlling and that *Mandujano-Rangel* are distinguishable. It is contended that the Defendant was not a focal point or "target" of the investigation when subpoenaed to appear; and that he was not questioned about previous criminal offenses so as to become a "virtual" or "putative" defendant called for the purpose of facing a Hobson's choice between giving self-incriminating evidence on the one hand or perjurious testimony on the other. Rather, the only offense involved was the alleged perjury committed after he appeared as an ordinary witness and, the Government urges, to hold that he was entitled to a warning before testifying would belie the *Orta* rationale that a witness may not assert the Fifth Amendment to avoid committing perjury in answering questions not yet asked.

■ The force of this argument is irrefutable with respect to the Defendant's initial appearances before the Grand Jury on May 3, 6 and 7. But it completely overlooks (or studiously ignores) the manifest change in the Defendant's status between those initial appearances in early May and his subsequent appearance in June. He began as an ordinary or "third-party" witness, but by the end of his first session with the Jury on the afternoon of May 7, the transcript leaves no doubt that he had become a suspected perjurer. Indeed, he now stands indicted for that offense committed at that time, and to the extent the motion to suppress is addressed to *that* testimony, it will be denied. By the same token, however, when he was subsequently subpoenaed to reappear on June 3, he arrived in focus as a suspected perjurer—an ancillary target perhaps, but a target nonetheless; and it is difficult to understand the Government's contention to the contrary when the record plainly shows that the Defendant was all but told as much in point blank fashion at the outset of the June 3 session by the United States Attorney himself through the remark that there was "concern" about Defendant's previous testimony.

At argument on the pending motion Government counsel suggested that the Defendant was not yet a perjurer in the eyes of the prosecution forces on June 3 because he was merely being afforded an opportunity to recant under 18 U.S. C.A. § 1623(d),[3] and, in addition, the

---

3. An alternative ground of the Defendant's motion to suppress is the failure on the part of the interrogators to expressly advise him of the recantation provisions of the statute, especially since they undertook to caution him concerning the provisions of subsection (a) of § 1623. See United States v. Lardieri, 497 F.2d 317 (3rd Cir. 1974). The result reached by the Court makes it unnecessary to decide this issue.

prosecution desired to insure that the critical questions propounded in May were restated with greater precision so as to avoid the pitfall of Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). Either way, the argument is a classic *non sequitur*. There is no reason to offer an opportunity of recantation unless there is something to recant; and a prosecutor with prior testimony in hand and *Bronston* in mind is doing nothing more than shoring up his case "with one eye on a possible prosecution." (*Mandujano, supra*).

Finally, the fact that *Orta* is inapplicable in circumstances involving two separate and distinct appearances before the Grand Jury is clearly demonstrated by Chief Judge Brown's incisive observation in United States v. Wilcox, *supra* (450 F.2d at 1141):

"And so when a witness is asked a question that could show that he had already committed a crime, i. e., perjury at a prior trial, his refusal to answer is permissible almost by the definition of self-incrimination. He is still criminally accountable for his perjury, but he may not be convicted out of his own mouth over his claim of privilege. Thus the aphorism that one cannot take the Fifth Amendment on the ground that if he testifies he will perjure himself applies only as an excuse for not testifying *initially*. It does not mean that having once testified, the Fifth Amendment is not available to avoid giving further testimony which might expose the witness to substantial risk of prosecutions growing out of the prior testimony." (Emphasis supplied)

*Orta* controls as to May 3, 6 and 7. *Mandujano-Rangel* controls as to June 3. The motion to suppress is denied as to the testimony given in May, and granted as to the testimony given in June. Whether the June testimony may be used for impeachment or rebuttal is a question reserved by the Court pending

developments at trial. See Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

The Court is constrained to make two additional observations. The first is that the Defendant in this case is a trained and experienced, practicing lawyer. To suppress his testimony because he was not properly warned of his Constitutional rights may seem to many as a complete departure from reality for the purpose of promoting ritualistic form over substance. The answer is supplied by the fountainhead itself—Miranda v. Arizona, 384 U.S. 436, 468–469, 86 S.Ct. 1602 (at 1625), 16 L.Ed.2d 694 (1966):

"The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clear-cut fact. More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time."

Secondly, although a portion of the rationale of *Mandujano* and of this ruling includes a finding of basic prosecutorial unfairness and denial of due process in addition to the fundamental Fifth and Sixth Amendment precepts of *Miranda,* the Court should not be understood as leveling any criticism toward the United States Attorney or any of his assistants. The cliché that hindsight is always 20/20 is particularly appropos in this instance since *Mandujano* was decided after the events here involved.