[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 20, 2006
THOMAS K. KAHN
CLERK

———————————————

No. 05-16299

———————————————

D. C. Docket No. 04-00506-CR-1-ODE-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STANLEY STREET,

Defendant-Appellant.

———————————————

Appeal from the United States District Court
for the Northern District of Georgia

———————————————

**(December 20, 2006)**

Before CARNES and MARCUS, Circuit Judges, and JORDAN,[*] District Judge.

CARNES, Circuit Judge:

---

[*] Honorable Adalberto J. Jordan, United States District Judge for the Southern District of
Florida, sitting by designation.

Stanley Street was indicted for robbing three Atlanta area banks, in violation of 18 U.S.C. §§ 2113(a) & (d), and using a firearm during the commission of each robbery, in violation of 18 U.S.C. § 924(c). After the district court denied Street's motion to suppress his confessions, a jury convicted him of all the charges. He was sentenced to 771 months in prison. Street contends that the district court erred in admitting his confessions and incriminating statements at trial and erred in denying his motion for a judgment of acquittal based on the government's failure to offer evidence of proper venue.

## I.

At 11:00 a.m. on August 31, 2004, a customer was waiting at the drive-through window of an Atlanta area Wachovia bank branch when the teller motioned to her that the bank was being robbed. As the customer pulled out of the drive-through line, she called 911 and then saw a man dressed in a black hooded jacket leave the bank and get into a small gray car. While watching the man get into the car, the customer noticed a manager at the bank's front window pointing at the man. Describing the suspect's movements to the 911 operator, the customer watched as the gray car peeled backwards out of the bank parking lot. She followed the car, eventually pulling up behind it at a red light where she read the license tag number to the 911 operator. Having performed her duties as a good

2

citizen, the customer stopped following the car. The Atlanta police ran the tag number and traced the car, a gray Toyota Corolla, to a Hertz Rent-a-Car at the Atlanta airport. They contacted Hertz and learned that earlier in the day that car had been rented to a Stanley Street, who had been a police officer for twenty-two years—five in Savannah and the last seventeen in Atlanta.

As a result of that information, two unmarked cars containing four FBI agents and an Atlanta police detective set up surveillance in Street's neighborhood and waited. Sometime around 5:00 p.m. the Corolla pulled out of Street's driveway. Both cars followed the Corolla as it exited the subdivision and drove to a gas station. The driver, later identified as Street, filled the Corolla with gas and left. Street matched the description of the suspect of that morning's robbery and two other Atlanta bank robberies that had occurred in June and July, which the agents believed were related to this one. After the Corolla pulled out of the gas station, the supervising FBI agent, Jeffery Holmes, gave the order to initiate a traffic stop. One car pulled in front of Street, blocking his path, and the other pulled up behind him.

As the five officers exited the cars, Street got out of his vehicle. He told the officers his name and stated that he was an Atlanta police officer. Agent Holmes identified himself as an FBI agent and told Street that he wanted to discuss the

3

Corolla and the fact that it may have been involved in a bank robbery earlier that day. The officers were in plain clothes with their weapons holstered, and they explicitly informed Street that he was not under arrest. The agents told Street that they could discuss the rental car there in the road or return to Street's house, located about two miles away. Street agreed with their suggestion that he accompany them to his home, and he rode in the front seat of one of the unmarked cars while another agent drove the Corolla.

A few minutes after 5:00 p.m., the group arrived at Street's house. Agent Holmes asked if they could go inside to talk about the Corolla, and Street invited them into the living room. During the entire interview, Street's parents watched television in another room and were not bothered by the agents.

The agents asked Street about his activities earlier that day and how he had acquired the Corolla. He told the agents that he got off work at 6:30 a.m. that morning, rented the car, and came home and slept until 12:30 p.m., when he was awakened by a lawn man. Street gave inconsistent answers to some of the questions. As one of the agents testified, "There were a lot of inconsistencies about how the rental car got from the airport, or how he got from his house to the airport and back with the rental car and where the cars were." Those inconsistencies increased the agents' suspicions.

4

After about an hour the agents asked Street if he would consent to a search of both the Corolla and his own vehicle, which was located in the garage. Street both consented orally and signed a consent to search form. The form states that the search occurred at 6:00 p.m. Street answered more questions as he watched the agents search the vehicles. They discovered a loaded handgun clip on the front right floorboard of the Corolla. They knew that a handgun had been used in all three bank robberies. Street told the agents that the clip they found belonged to a back-up weapon that he had lost nine months earlier. The agents left the clip in the car, but Agent Fitzgerald thought that it was "somewhat unusual" that the clip to a weapon Street claimed to have lost months before was on the floor of a car that he had rented earlier that day. The search of the vehicles lasted about thirty minutes, and two agents left Street's house once the search was completed.

The agents and Street then returned to the living room where the interview continued. About an hour later the agents asked Street if he would consent to a search of his bedroom suite. Street agreed and signed another consent to search form. Although the form authorized the agents to search the entire house, they were only interested in searching Street's bedroom and the adjoining closet/bathroom area.

While Street was in the closet area with some of the others, Agent Fitzgerald

5

noticed Street's police officer duty belt on the floor of the bedroom. He picked up the APD radio that was on the belt and turned it on. Because Fitzgerald was on a task force with some other Atlanta police officers, he was familiar with the department's radio zones. He noticed that the radio had been turned to Zone 2, which is the zone where that morning's robbery took place, and not Zone 1, the one to which Street was assigned. Fitzgerald turned off the radio and replaced it in Street's duty belt on the floor.

When Street came into the bedroom Agent Fitzgerald asked him about his assigned work zone and what he did with his equipment when he got off work. Street responded that he worked in Zone 1 and that at the end of the day he turned off his radio and took off his belt. Fitzgerald then picked the radio back up, turned it on, and asked Street why the radio was turned to Zone 2. Street responded that he had been monitoring Zone 2. Fitzgerald informed Street that he did not believe him and that he could easily check police logs to see precisely when Street turned his radio to Zone 2. Street lowered his head and said "F— it." That statement came at the end of the bedroom search, which had lasted about forty-five minutes.

In response to Street's expletive, Agent Fitzgerald asked him if he wanted to talk about the robberies. Street said yes, and Fitzgerald suggested that they go back downstairs to sit in the living room. They did. Fitzgerald, Holmes and a third

6

agent, Myers, sat down with Street in the living room.

Agent Fitzgerald asked Street about that morning's robbery. When Street responded that he needed money to pay his private security business payroll, Fitzgerald let Street finish and then orally advised him that he had a right to remain silent and a right to have a lawyer present. After giving Street those truncated Miranda warnings, Fitzgerald began to question Street generally about the robbery, and Street gave Fitzgerald an overview of his involvement in the crime, apparently making incriminating statements. (Nowhere in the record are the details of those statements disclosed.) After that, Agent Myers presented Street with a written waiver form, which fully described his Miranda rights. After discussing the form with the agents, Street signed it at 8:00 p.m. Thereafter, Street continued to confess, eventually admitting to all three robberies.

After Street had completed his oral statement, Agent Fitzgerald asked him if he would prepare a written confession. Street said that he was too upset to write anything down, but when Fitzgerald offered to write out a statement for him, Street agreed. Fitzgerald then drafted a statement, asking Street clarifying questions as he went along. After completing the statement, Fitzgerald read it to Street. Street then read the statement to himself, made two corrections, initialed each page, and signed and dated the statement.

The agents then allowed Street to make several phone calls, organize his personal affairs, and say goodbye to his parents before he was officially placed under arrest, handcuffed for the first time, and taken to the police station. The agents escorted Street from his home sometime between 9:30 p.m. and 10:00 p.m. The rented Corolla was towed to FBI headquarters, where the pistol clip was retrieved.

After Street was indicted, he filed a motion to suppress the confessions he had made to the FBI agents. A magistrate judge held a suppression hearing and then recommended that the district court deny the motion. The district court did so and adopted in part the magistrate judge's findings of fact. At the conclusion of a three day trial, a jury found Street guilty of all the charges against him, and he was later sentenced to 771 months imprisonment. This is his appeal.

## II.

Street's first contention is that the duration of his detention leading up to his confessions exceeded that which was permissible based on reasonable suspicion under Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968), and thereby constituted an arrest without probable cause. On that basis he argues that his confessions should have been suppressed as the products of an arrest that violated the Fourth Amendment. The district court rejected this contention on two grounds. One was

8

that the agents' stop and the ensuing investigation of Street was based on reasonable suspicion and proper under Terry, and Street was not in actual custody until after his oral and written confessions. The court's alternative ground for rejecting Street's contention was that even if the Terry stop was transformed by the passage of time into a de facto arrest at some point before Street confessed, there was probable cause at or before the transformation. If so, there was no Fourth Amendment violation and thus no need to suppress the confessions for that reason.

"For probable cause to exist, . . . an arrest must be objectively reasonable based on the totality of the circumstances." Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002). "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . an offense." Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998) (internal quotations omitted). The officer's own subjective opinions or beliefs about probable cause are irrelevant, because it is an objective standard. Craig v. Singletary, 127 F.3d 1030, 1042–43 (11th Cir. 1997).

We agree with the district court that the agents had probable cause to arrest Street long before he first confessed. Sometime after they pulled over Street's car just after 5:00 p.m. and before he signed the consent to search form at 6:00 p.m.,

the agents had probable cause to believe that Street was the bank robber. By 6:00 p.m. the agents knew all of the following: (1) an eyewitness had seen the robber leave the crime scene that morning and followed the car, describing it and calling out the tag number to the 911 operator; (2) Street had rented a car matching that description and with the same tag number earlier that morning before the robbery; (3) Street had given the agents inconsistent answers to questions, including ones about how he had gotten to the airport to pick up the rental car and then gotten home in it; and (4) Street matched the description of the man who had committed the three bank robberies. These facts combined provide enough basis for a reasonably prudent person to believe that Street had committed the bank robbery. See United States v. Barnett, 423 F.2d 694, 694 (9th Cir. 1970) (probable cause existed where defendant matched physical description of the robber and his name and address matched that of the tag on the getaway car); Hollins v. United States, 338 F.2d 227, 229 (9th Cir. 1964) (probable cause existed where defendant matched general description of the robber and a car with the same tag number was parked in his driveway and registered to his wife).

Of the facts that we have included in our probable cause analysis, the last to occur was Street's inconsistent answers to the agents' questions about the rental car. We cannot tell from the district court's findings or the record exactly when

10

Street gave those inconsistent answers, only that it happened sometime before 6:00 p.m., which is when he signed the consent to search form. By that time, at the latest, there was probable cause to believe that Street was the bank robber, so there is no Fourth Amendment problem with any detention of him from 6:00 p.m. until he began confessing, which we know was sometime before 8:00 p.m. (the time on the waiver of rights form Street signed). The question is whether any detention of Street from the time he was stopped at shortly after 5:00 p.m. until probable cause had clearly been established by 6:00 p.m., at the latest, exceeded the bounds of a legitimate Terry stop. Probable cause may have existed even before then, but we need not decide that because it does not matter to the result in this case.

In Terry the Supreme Court formulated a two-fold inquiry for examining whether an investigative stop is unreasonable under the Fourth Amendment: "[I]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 19–20, 88 S. Ct. at 1879. Street concedes, as he must, that the agents clearly had reasonable suspicion to pull him over in his rental car shortly after 5:00 p.m., based on the evidence they had that a car with that same tag number had been used in the robbery. The stop was justified at its

11

inception, leaving us with the question of whether the continuation of the stop was reasonably related in scope to the circumstances giving rise to it—those circumstances being the need to confirm or dispel the suspicion that Street was the bank robber.

In United States v. Hardy, 855 F.2d 753 (11th Cir. 1988), we set out four, nonexclusive factors to aid us in differentiating between a Terry stop and an arrest: (1) the law enforcement purpose served by the detention; (2) the diligence with which the officers pursued the investigation; (3) the scope and intrusiveness of the investigation; and (4) the duration of the detention. Id. at 759. In balancing these factors, we are to focus on "whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Acosta, 363 F.3d 1141, 1147 (11th Cir. 2004) (citing United States v. Sharpe, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575 (1985)).

As to the first factor, the agents stopped Street and questioned him in order to determine why he was in possession of the same car that had been used in a bank robbery earlier that day. This was a valid purpose, and they continued to pursue it throughout the period leading up to the existence of probable cause, which was established no more than an hour after the stop was made.

12

The second <u>Hardy</u> factor is the diligence with which the officers pursued the investigation. 855 F.2d at 759. The district court's finding that the agents were diligent is amply supported by the record. At no time was there an unjustified pause in the inquiry. As the district court characterized it, "each segment of questioning increased the quantum of reasonable suspicion sufficient to allow continuation of the detention." The agents had a lot of reason to suspect Street to begin with—his rental car apparently had been used by the robber to flee the scene of the crime, and he matched the description of the person who had robbed the banks. They diligently questioned Street in order to confirm or dispel the suspicions arising from those facts. His inconsistent answers to their questions increased their suspicions. The agents were not dilatory in the investigation and questioning, which led them to probable cause justifying further detention.

The third <u>Hardy</u> factor is the scope and intrusiveness of the investigation. <u>Id.</u> Street chose to permit the officers to question him inside his home instead of on the street. He was neither personally searched nor was he handcuffed or otherwise confined. He was told he was not under arrest. The agents did not perform a protective sweep of the house. Street was free to move about it. The agents asked for his permission before searching any parts of the house or the cars. Street's parents were in the house undisturbed during the entire investigation. The agents'

13

conduct was no more intrusive than absolutely necessary.

The fourth and final <u>Hardy</u> factor is the duration of the stop or detention.  <u>Id.</u> As we have already pointed out, we cannot be sure exactly when Street gave the agents inconsistent answers to their questions, including those about how he had gotten the rental car that was used as a getaway car in the robbery.  We do know, however, that Street gave those answers sometime before 6:00 p.m. when he signed the consent to search form.  Making the assumption—generous in Street's favor—that he gave the inconsistent answers immediately before he signed the consent to search form, the duration of the stop was just under sixty minutes.  We cannot say that sixty minutes is always too long.  The Supreme Court has made clear that there is no quantifiable, bright line rule:

> But our cases impose no rigid time limitation on <u>Terry</u> stops.  While it is clear that the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion, we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.  Much as a "bright line" rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.

<u>Sharpe</u>, 470 U.S. at 685, 105 S. Ct. at 1575 (citations and quotation marks omitted).

The fact that the duration of the stop was sixty minutes does not override the other

14

three factors weighing in favor of its validity in these circumstances. <u>See</u> <u>United States v. Gil</u>, 204 F.3d 1347, 1350–51 (11th Cir. 2000) (upholding detention under <u>Terry</u> where defendant was handcuffed in the back of a police car for seventy-five minutes); <u>Hardy</u>, 855 F.2d at 761 (under the circumstances detention for fifty minutes was not too long for <u>Terry</u> purposes).

The two decisions cited by Street, <u>United States v. Codd</u>, 956 F.2d 1109 (11th Cir. 1992), and <u>United States v. Perez-Esparza</u>, 609 F.2d 1284 (9th Cir. 1980), are distinguishable. In <u>Codd</u> the defendant was seized, handcuffed, searched and detained in an airport police station for two and a half hours. 956 F.2d at 1110. In <u>Perez</u> the defendant's car was stopped at a border checkpoint, and he was held in an interrogation room for three hours. 609 F.2d at 1287. In both cases the defendants were held in police-controlled locations and were not allowed to move. Here, on the other hand, Street was offered a choice about where he would be questioned; he was questioned in the comfort of his own home; and he was not handcuffed or restrained in any way. He was free to move about and did so. Unlike the suspects in <u>Codd</u> and <u>Perez</u>, Street was not detained for longer than sixty minutes without the existence of probable cause.

For these reasons, we agree with the district court that any detention of Street before probable cause was established did not violate the Fourth Amendment.

## III.

Street also contends that Agent Fitzgerald's examination of Street's police radio amounted to an unauthorized search in violation of the Fourth Amendment. Since Street confessed after being confronted with the fact that his police radio had been turned to the zone in which the robbed bank was located, he argues that his confessions should have been suppressed as the products of an unconstitutional search. It is not clear to us that Street had a privacy interest in his officially issued police radio, but even if he did his contention fails.

One of Street's arguments is that by picking up the radio off the floor of Street's bedroom and turning it on, Agent Fitzgerald violated Ga. Code Ann. § 35-1-5, a statute prohibiting actions that interfere with police radio activity. Picking up a police radio and turning it on is not interference with police radio activity, and even if it were, violating a state statute is not tantamount to violating the federal Constitution. Cf. Knight v. Jacobson, 300 F.3d 1272, 1275–76 (11th Cir. 2002) (arrest supported by probable cause does not contravene the Fourth Amendment even if it violates state law).

Street's other arguments have to do with whether he had authority to, and actually did, consent to Fitzgerald's examination of the radio. He argues that he could not have consented to Agent Fitzgerald's inspection of the radio because he

16

did not have the authority to consent since the radio was intended only for official use. This argument is a non-starter. Inspecting a law enforcement agency's radio for signs of criminal activity is an official use, because the purpose of the agency that owns the radio is to investigate criminal activity. Besides, even if Street actually had lacked authority to consent to a search of the radio, the issue is whether an agent in Fitzgerald's place would have had an objective, reasonable belief that Street was authorized to do so. See Illinois v. Rodriguez, 497 U.S. 177, 188, 110 S. Ct. 2793, 2801 (1990). Because the radio was assigned to Street, who was in possession of it, and the radio was to be used for law enforcement purposes, an agent reasonably would have believed that Street could consent to a search of it to investigate criminal activity.

Street argues that he did not consent to a search of the radio. We have noted that "[a] consensual search is confined to the terms of its authorization. The scope of the actual consent restricts the permissible boundaries of a search in the same manner as the specifications in a warrant. When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless. Rather it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." United States v. Taylor, 458 F.3d 1201, 1206 (11th Cir. 2006) (quoting United States v.

Strickland, 902 F.2d 937, 941 (11th Cir. 1990)). In assessing reasonableness, we consider what the parties knew to be the object of the search at the time the search occurred. United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992).

We agree with the district court that Street consented to a general search of his bedroom and its contents. The consent form that Street signed specifically stated that the FBI was "permit[ted] [to conduct] a complete search" of the house as a whole and "authorize[d] the[] agents to take any items which they determine[d] may be related to their investigation." Nowhere in or on the form he signed did Street indicate a desire to restrict the search. Nor did he otherwise indicate to the agents that he wanted to exclude any property from the scope of the search. The agents' belief that the police radio, in plain view on the bedroom floor, was within the scope of the consent was reasonable. See United States v. Melendez, 301 F.3d 27, 33 (1st Cir. 2002) (finding that the officers did not exceed the mother's general consent to search the bedroom when they dismantled a speaker, because "the stereo speaker was not a sealed container and did not bear indicia of an expectation of privacy . . . [and it] was located in the area that [she] had allowed the officers to search"). Because the search was justified based on consent, there was no Fourth Amendment violation.

18

## IV.

The final suppression issue is a Fifth Amendment one arising from the fact that the first verbal warnings Agent Fitzgerald gave Street were inadequate to measure up to the requirements of Miranda v. Arizona, 384 U.S. 436, 478, 86 S. Ct. 1602, 1630 (1966). As a threshold question, we need to determine when Street was in custody, because pre-custodial questioning does not require Miranda warnings. See United States v. Brown, 441 F.3d 1330, 1347–49 (11th Cir. 2006).

## A.

"A defendant is in custody for the purposes of Miranda when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" Id. at 1347 (quoting California v. Beheler, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983)); see also United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001) (Whether a suspect is in custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." (quotation marks and alterations omitted)). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996). "[U]nder the objective standard, the reasonable

19

person from whose perspective 'custody' is defined is a reasonable innocent person." Id.  In applying this test there are several factors we are to consider, including whether "the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." United States v. Long, 866 F.2d 402, 405 (11th Cir. 1989).  It is a totality of the circumstances determination.  Brown, 441 F.3d at 1347, 1349.

The fact that we have already determined that the agents had sufficient probable cause to arrest Street sometime before 6:00 p.m., which ended any Terry stop problems at that point, does not mean that Street was in custody for Miranda purposes from that time forward.  Because there is no constitutional right to be arrested, a suspect cannot complain that officers postponed arresting him in order to obtain more incriminating statements or other evidence against him.  Hoffa v. United States, 385 U.S. 293, 310, 87 S. Ct. 408, 417 (1966); United States v. Archbold-Newball, 554 F.2d 665, 675 (5th Cir. 1977); United States v. Cravero, 545 F.2d 406, 413 (5th Cir. 1977); Koran v. United States, 469 F.2d 1071, 1071–72 (5th Cir. 1972).

As some of our sister circuits have decided, a seizure does not necessarily constitute custody for Miranda purposes.  See United States v. Newton, 369 F.3d 659, 672 (2d Cir. 2004); United States v. Hudson, 210 F.3d 1184, 1191 (10th Cir.

20

2000); United States v. Bengivenga, 845 F.2d 593, 598 (5th Cir. 1988) (en banc). The standards are different.  The Fourth Amendment seizure analysis uses the "free to leave" test:  a person is "seized" when "a reasonable person would [not] feel free to terminate the encounter" with the police.  Miller v. Harget, 458 F.3d 1251, 1257 (11th Cir. 2006).  By contrast, a person is in "custody" for Miranda purposes only when there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  Beheler, 463 U.S. at 1125, 103 S. Ct. at 3517.

Street contends that he was in custody for Miranda purposes from the moment he said "F— it" after Agent Fitzgerald pointed out that he could look at the police radio logs to check Street's story about why his radio was turned to the same zone where the robbed bank was located.  In Street's view, all of the incriminating statements he made from that point forward should have been suppressed because Fitzgerald screwed up the Miranda warning that he gave Street immediately after Street uttered the expletive.  The district court concluded, and the government argues, that Street was not in custody for Miranda purposes until Fitzgerald orally advised him of his rights, which occurred shortly after Street uttered the expletive but not before he had made some incriminating statements in response to questioning.  Because it does not matter to the result, we will not pause to figure out the exact moment custody began but will instead assume that Street is

21

correct:  custody for Miranda purposes began immediately after the expletive.

**B.**

We begin our consideration of the issue involving the adequacy of the oral warnings with the observation that although the district court opinion seems to imply that the quality of Miranda warnings required may vary with the suspect's actual knowledge of his rights, the government has not argued that Street's twenty-plus years of experience as a cop matters in this regard.  The government's reserve on the point is well founded, given this passage from the Miranda opinion itself:

> The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given.  Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact.  More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time.

Miranda, 384 U.S. at 468–69, 86 S. Ct. at 1625 (citation omitted); see United States v. Longbehn, 850 F.2d 450, 453 (8th Cir. 1988) (rejecting the argument that the suspect's position as a police officer obviates the requirement of a Miranda warning); United States v. Bland, 908 F.2d 471, 474 n.1 (9th Cir. 1990) (rejecting

22

the argument that because the suspect had prior experience with the criminal justice system, he knew of his rights and did not have to be completely warned); United States v. Prior, 381 F. Supp. 870, 877 (M.D. Fla. 1974) (rejecting the argument that a trained and experienced practicing attorney was not entitled to his full Miranda rights). We will examine the adequacy of the warnings Street was given as if he were a layman.

The government's position, backed up by the district court's conclusion, is that the oral warnings Agent Fitzgerald gave Street were adequate, albeit not as full as they could have been. Fitzgerald testified: "I believe when I was talking to him orally, I told him he has a right to remain silent and he has a right to have a lawyer present, and that's probably pretty much all I told him." The district court credited that testimony, and the parties have shaped their positions around it. Street argues that what Fitzgerald told him was not enough to comply with Miranda, and we agree with him.

The Miranda opinion itself clearly sets out the required elements of the warnings:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

23

384 U.S. at 479, 86 S. Ct. at 1630.  Agent Fitzgerald's warning to Street was only halfway adequate.  It omitted the advice that anything Street said could be used against him in a court of law, and that if he could not afford an attorney one would be appointed for him.  This is one instance in which halfway is not close enough for government work.

It is true that the Supreme Court said in California v. Prysock, 453 U.S. 355, 359, 101 S. Ct. 2806, 2809 (1981) (per curiam), that "the 'rigidity' of Miranda [does not] exten[d] to the precise formulation of the warnings given a criminal defendant" and that "no talismanic incantation [is] required to satisfy its strictures." But the facts of the Prysock case belie any extension of its holding to these facts here.

The suspect in Prysock was told that he had the right to remain silent; that if he gave up that right anything he said could be used against him in a court of law; that he had the right to talk to a lawyer before he was questioned, while he was being questioned, and all during the questioning; and that he had a right to have a lawyer appointed to represent him at no cost.  Id. at 356–57, 101 S. Ct. at 2808.  A state appellate court had reversed Prysock's conviction because he had not been specifically advised that the right to have counsel appointed applied before any further questioning was conducted.  Id. at 358–59, 101 S. Ct. at 2809.  The

24

Supreme Court characterized the lower court as holding that the warnings, which included every element required by Miranda, were deficient "simply because of the order in which they were given." Id. at 361, 101 S. Ct. at 2810. While the Court understandably rejected that overly picky application of Miranda, it did so only after explaining that the officers in that case had advised the defendant of all of his rights. Id. That was not a case, like this one, where the warnings covered only half of the rights.

Duckworth v. Eagan, 492 U.S. 195, 109 S. Ct. 2875 (1989), is another decision involving the adequacy of particular warnings, and the Supreme Court did say in that case, "[w]e have never insisted that Miranda warnings be given in the exact form described in that decision." Id. at 202, 109 S. Ct. at 2880. But the facts of Duckworth are readily distinguishable from those of this case. Duckworth, unlike Street, was fully and completely advised of all of his rights, not just half of them. Id. at 198, 109 S. Ct. at 2877–78. The only question in that case was whether the right to appointment of counsel means the right to have one appointed then and there, or instead it is enough that counsel would be appointed, as Duckworth was advised, "if and when you go to court." Id. at 197–98, 109 S. Ct. at 2877–78. The Supreme Court held that the "if and when" contingency did not misrepresent the nature of the right to have counsel provided, given the fullness of

25

the warnings provided to Duckworth.

The problem in the case before us now is not one of form or phrasing, but of substance and omission. Street was not told that anything he said could be used against him in court, advice which "is needed in order to make [the suspect] aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege." Miranda, 384 U.S. at 469, 472, 86 S. Ct. at 1625, 1626–27. Nor was Street advised that if he could not afford an attorney, one would be appointed for him, specific advice which is needed to convey that "[t]he financial ability of the individual has no relationship to the scope of the rights involved here," and that "[t]he privilege against self-incrimination secured by the Constitution applies to all individuals. . . . indigent as well as the affluent." Id. at 472, 86 S. Ct. at 1626–27.

## C.

Because the oral Miranda warnings Agent Fitzgerald gave Street were inadequate, any statements depending on those warnings for admission should have been suppressed. Street, therefore, concludes that all of the statements he made after the defective first set of warnings were inadmissible. The government disagrees, saying that any suppression required by shortcomings in the first set of

26

Miranda warnings should not extend beyond the point where the letter perfect second set of warnings were given. In its view the giving of the full Miranda warnings acts as a stop-loss point for any problem with the incomplete warnings. As goes this issue so goes the conviction because the most damaging statements Street made, including his comprehensive written confession, came after he had received the second full set of warnings and signed a waiver of his rights.

In determining whether a properly warned confession is admissible where the defendant has first given an unwarned or improperly warned confession, we turn to the Supreme Court's decisions in Oregon v. Elstad, 470 U.S. 298, 105 S. Ct. 1285 (1985), and Missouri v. Seibert, 542 U.S. 600, 124 S. Ct. 2601 (2004). Elstad sets out the general rule that the existence of a pre-warning statement does not require suppression of a post-warning statement that was knowingly and voluntarily made, 542 U.S. at 309, 105 S. Ct. at 1293, while Seibert sets out an exception for situations where police employ a deliberate "question first" strategy. 542 U.S. at 617, 124 S. Ct. at 2613.

In Elstad, the defendant confessed after being subjected to unwarned custodial questioning at his house. 470 U.S. at 300–01, 315, 105 S. Ct. at 1288–89, 1296. The officers then took the defendant to their headquarters and an hour later gave him Miranda warnings for the first time. Id. at 301, 150 S. Ct. at 1289. He

27

waived his rights and made a full confession, both orally and in a signed statement. Id. The Supreme Court rejected the defendant's contention that the second confession should have been suppressed as "fruit of the poisonous tree," the poison being the failure to advise him of his rights before he confessed the first time. Id. at 302, 309, 105 S. Ct. at 1289, 1293. The Court explained that it would be an "unwarranted extension of Miranda" to suppress not only unwarned statements but also later statements that were knowingly and voluntarily made after proper warnings were finally given. Id.

The rule of Elstad is that "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Id. In making this determination courts are not to presume that the existence of the earlier unwarned statement compelled the defendant to give another one, but instead should assume that ordinarily giving proper Miranda warnings removes the effect of any conditions requiring suppression of the unwarned statement. Id. at 314, 105 S. Ct. at 1296. Where both confessions are voluntary, there is no justification for suppressing the "highly probative evidence of a voluntary confession." Id. at 312, 105 S. Ct. at 1294–95; see also id. at 318, 105 S. Ct. at 1298 ("The relevant inquiry is whether, in fact, the second statement was also voluntarily made.").

The Elstad general rule applies both to instances, like this one, where the initial statements are inadmissible because of defective warnings and to those where no warnings were given at all before the first statements. See Bryant v. Vose, 785 F.2d 364, 366–67 (1st Cir. 1986); Watson v. DeTella, 122 F.3d 450, 453–45 (7th Cir. 1997). Under the Elstad general rule, the statements Street made after he was fully advised of his Miranda warnings are admissible, because all of his statements were knowingly and voluntarily made. Street was questioned in his home; he was not threatened or coerced; he was not confined or restrained; the questioning was done in a conversational tone; it was not unduly prolonged; he was told of some of his rights early on; and given his twenty-plus years of law enforcement experience, Street was familiar with investigative processes and techniques.

The Elstad general rule is subject to the Seibert exception, which is aimed at putting a stop to the deliberate use of a particular police tactic employed for the specific purpose of undermining the Miranda rule. 542 U.S. at 618, 124 S. Ct. at 2614 (Kennedy, J., concurring). The tactic in question is one where the police are instructed, as a matter of policy, to purposefully withhold Miranda warnings while interrogating a suspect in custody in order to obtain a full confession first and then provide him with full warnings and get him to re-confess. Id. at 605–06. The

process is known as the "two-step" or "question first" tactic, and it did not find favor in the Supreme Court.

Because Seibert is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law. United States v. Gonzalez-Lauzan, 437 F.3d 1128, 1136 n.6 (11th Cir. 2006); see also Romano v. Oklahoma, 512 U.S. 1, 9, 114 S. Ct. 2004, 2010 (1994); Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 993 (1977). As Justice Kennedy explained, suppression of a post-warning confession is required if "the two-step interrogation technique [is] used in a calculated way to undermine the Miranda warning." Seibert, 470 U.S. at 622, 124 S. Ct. at 2616. That means that if an officer employs a strategy of deliberately questioning an in-custody suspect without any Miranda warnings in order to get a confession, planning to later warn the suspect and get him to repeat his confession, the post-warning confession is inadmissible unless the officer took specific curative steps to ensure that the mid-interrogation warnings achieved the purpose the Miranda decision intended. Id. at 621, 124 S. Ct. at 2615–16. The curative measures required are a "substantial break in time and circumstance between the prewarning statement and the Miranda warning" or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." Id. at 622, 124 S. Ct.

30

at 2616. Curative measures are necessary only where the "question first" tactic has been used. Otherwise, the <u>Elstad</u> general rule that post-warning statements are admissible, even where they follow pre-warning statements that are not, governs.

We will assume for purposes of this case that the <u>Seibert</u> "question first" exception may apply when incomplete or defective warnings are given, just as when no warnings are given. In deciding whether the agents used the "question first" tactic against Street, we consider the totality of the circumstances including "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements." <u>United States v. Williams</u>, 435 F.3d 1148, 1159 (9th Cir. 2006).

The questioning of Street before he was given the full <u>Miranda</u> warnings was brief and general. Agent Fitzgerald did not withhold <u>Miranda</u> warnings, solicit a full confession, and then lead Street back through his confession again. Fitzgerald gave Street partial warnings up front. Because giving any warnings undermines the effectiveness of the "question first" tactic, the fact that some warnings were given strongly evidences that the tactic was not being used. Fitzgerald did not set out to intentionally circumvent or undermine the protections the <u>Miranda</u> warnings provide. He just messed up. In order for <u>Seibert</u> to apply, "the two-step

31

interrogation technique [must be] used in a calculated way to undermine the Miranda warning." 470 U.S. at 622, 124 S. Ct. at 2616. Because it was not, this is not a Seibert exception case.

This is instead an Elstad general rule case. Seibert, 470 U.S. at 622, 124 S. Ct. at 2616 ( "The admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed."). As we have already explained, under the Elstad general rule the incriminating statements Street gave after he received the full, second set of Miranda warnings were properly admitted. The same cannot be said of the statements Street made after he was in custody but before he was given the second set of warnings. Any evidence of those earlier statements should not have been put before the jury.

### D.

The harmless error rule, however, is applicable to evidence admitted in violation of the Miranda rule. United States v. Arbolaez, 450 F.3d 1283, 1292–93 (11th Cir. 2006); United States v. Diaz, 26 F.3d 1533, 1543 (11th Cir. 1994); United States v. Adams, 1 F.3d 1566, 1576 (11th Cir. 1993). The question is whether, after we subtract the statements that should not have been admitted at Street's trial, the remaining evidence is so overwhelming that we are convinced

32

beyond a reasonable doubt that the improperly admitted evidence did not affect the verdict. Adams, 1 F.3d at 1576.

Street's incriminating statements came in through the testimony of Agent Fitzgerald. He testified that after Street uttered the expletive, he asked Street if he wanted to talk about the bank robberies and he said yes. According to Fitzgerald, Street "proceeded to go through the three different bank robberies that were—the three different banks that were robbed." Fitzgerald advised Street of his right to remain silent and right to have a lawyer; Street responded that he understood but wanted to talk. Fitzgerald told the jury that Street gave "basically a general overview of the three bank robberies, about what happened, why he needed the money, to fund his business—side business, Atlanta's Finest Security Company." He had needed the money to meet his company's payroll. Fitzgerald also said that Street knew details about the three robberies and talked "about being covered up with disguise as well as having a gun, and how he also used pepper spray . . . as a diversion and he learned that diversion technique when he was in the marine corps."

By that time, Agent Fitzgerald had gotten the standard FBI waiver form and he read Street all of his rights from the form. After Street signed the form waiving his rights, he "went back over the bank robberies." Street dictated his confession

33

as Fitzgerald wrote it down for him. After it was complete, Fitzgerald read it to Street and Street read it to himself before signing it. The written confession, which was admitted into evidence as a government exhibit, is more thorough than the incriminating statements Street made before he was adequately warned of his rights; it recounts in greater detail what Street had said before he was adequately warned. As Fitzgerald explained to the jury:

> Well, we had already discussed the robberies prior to me writing this, and I went back and while I was writing, I was also talking with him to get the further details because I didn't have—verbally the first verbal interview that I had with him, it was just real general overview of the bank robberies, and the pepper spray was mentioned. When I was writing it, as I was writing, I would also be asking him questions and he was giving me more details. He was a little bit ahead of me . . . and I would have to stop him while I was writing . . . .

Because the improperly admitted statements were encompassed within the more detailed, properly admitted confession, the error was harmless. Bryant, 785 F.2d at 367 (finding harmless error in the admission of an oral confession where a properly admitted "written statement confirmed the details of the oral confession . . .; the jury therefore would have learned no more from the improperly admitted confession than it did from the properly admitted one"); United States v. Daniel, 932 F.2d 517, 521–22 (6th Cir. 1991) (where defendant's second, admissible

34

statement "supplied greater information" than the first, inadmissible one did, the first confession was "cumulative and unnecessary to establishing the case against the defendant" so that its admission was harmless error).

And, of course, the properly admitted written confession was not the only evidence against Street. There was also evidence establishing beyond doubt that the morning of the robbery Street rented the getaway car used in that robbery and he was driving it later that day. The robber used a pistol, and a loaded nine-millimeter pistol clip was found on the front floorboard of the rental car at Street's house that same day. His police radio was turned not to the zone he was assigned to but to the zone in which the robbed bank was located.

Additionally, David Freeman, another Atlanta police officer gone bad, who was in the same pretrial detention unit as Street, testified at trial that Street had sent him a note asking for advice. In the note, which was admitted into evidence, Street asked:

> Would you fight it knowing that the Government knows the following facts. I rented my getaway cars from the airport. They have pictures of my personal vehicle tag from the daily parking lot on each day of the robberies. If the Government requests my account books, they would see during the month of June when the first robbery took place I was in the red. But all of my bills were paid by cash. I did make several small cash deposits in my personal and business account of $2000.00. Now, none of the tellers can I.D. me and there are no fingerprints left behind. Would you challenge the Government or

would you take a plea and face maybe 10–17 years.

That note, the oral and written confessions Street made after being properly warned of his Miranda rights, and the other evidence we have discussed is damning enough. But there is more.

The jury also heard a tape recording of statements Street made to his six-year old daughter explaining to her why he was locked up. On a recorded line from the federal penitentiary in Atlanta, Street told her that: "Daddy was bad, right? Okay. Daddy got into some trouble and he was bad. He took some money that he wasn't supposed to take, okay? . . . And daddy had to go to jail, okay?" When his daughter asked: "Why did you take some money?" Street responded: "Daddy took some money because he ran out of money, okay? So, like I told you, when you be bad sometimes you have to be punished, you know what I mean? So right now daddy's just being punished."

No jury that heard all of the properly admitted, overwhelming evidence against Street reasonably could have had any doubt about his guilt. We are convinced beyond a reasonable doubt that the improper admission of the incriminating statements Street made before he was properly warned of his Miranda rights did not contribute to the jury's verdict.

# V.

Finally, we address Street's contention that the district court erred in denying his motion for a judgment of acquittal because, according to Street, the government did not prove proper venue.

At the end of the government's case-in-chief, Street moved under Rule 29 for a judgment of acquittal, claiming that the government had failed to prove that venue was proper. He argued that there was no direct evidence that the crimes had occurred in the Northern District of Georgia. The government argued that there was sufficient evidence to prove venue (citing, for example, the Atlanta addresses on the FDIC certificates of the three banks, which were in evidence). It also asked the court to take judicial notice of venue but the court declined, instead allowing the government to reopen its case-in-chief and offer additional testimony of venue. The government did so, recalling Agent Fitzgerald who testified that all three banks were located in Atlanta within the Northern District of Georgia.

After the government had put in that testimony, which unquestionably proved venue, the court asked "Shall we consider the Rule 29 motion renewed?" Defense counsel answered "Yes, your Honor, if you would." All the court said in response was "All right. Then I'll make the same ruling." In his brief, Street concedes that it is unclear what the court meant by "the same ruling." He wants it

to mean that the court was reserving a ruling on his motion for judgment of acquittal until the end of all the evidence. He bases his argument on that interpretation of the court's ambiguous remark.

Here is how Street's argument runs: Although it is unclear what the district court meant by "same ruling," the court must have intended to reserve ruling on the Rule 29 motion for judgment of acquittal until the close of all evidence; if so, the evidence introduced after the motion was made, which would include all the evidence the government put in when allowed to re-open, may not be considered. It may not be considered, Street argues, because the last clause of the last sentence of Rule 29(b) specifies that if the court reserves until the close of all the evidence its decision on a motion for judgment of acquittal, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

Street interprets that Rule 29 language to mean that if the court reserves a ruling on a motion for judgment of acquittal it may consider only the evidence that was in at the time the motion was made. That, however, is not what the rule says. Instead, it specifies that the evidence to be considered is that which is in at the time "the ruling was reserved." We follow the plain meaning of the actual words used in a court rule, just as we do with statutes. See <u>Bourjaily v. United States</u>, 483 U.S.

171, 178, 107 S. Ct. 2775, 2780 (1987); <u>Vencor Hosps., Inc. v. Standard Life & Acc. Ins. Co.</u>, 279 F.3d 1306, 1310 (11th Cir. 2002); <u>Burns v. Lawther</u>, 53 F.3d 1237, 1240 (11th Cir. 1995); <u>In re S. Atl. Fin. Corp.</u>, 767 F.2d 814, 818 (11th Cir. 1985); <u>In re Oesterle</u>, 651 F.2d 401, 403 (5th Cir. Unit B 1981).  Even if we interpret the court's remarks after the government had presented the additional evidence to mean that the court was at that point reserving a ruling until the end of the case—which is a stretch—we still consider the additional evidence of venue, because that evidence came in before the court announced that it was reserving a ruling.

The legal premise of Street's argument would fit the procedural facts if the court had reserved a ruling on his motion for judgment of acquittal before the government was allowed to put on its additional evidence of venue.  The curative evidence would then have come in after "the ruling was reserved," and for that reason could not be considered.  Unfortunately for Street, there is nothing in the record indicating that the court reserved a ruling on his motion before the additional evidence came in.  Nowhere prior to allowing the government to re-open did the court imply that it was going to reserve ruling on the motion until the close of the case.  The only rulings the court had made were that it would not take judicial notice outside the presence of the jury, and that the government would be

39

permitted to re-open its case in order to remove any questions about whether venue had been proven.

Besides, it would not make sense for the court to have permitted the government to re-open its case if the court had reserved a ruling on whether the government had proven venue. That would have been illogical because, as Street's argument underscores, the additional evidence could not have been considered on the issue if the court had reserved a ruling. It would have been pointless to allow that evidence in. The only reason to have allowed the government to put in additional evidence is to cure any venue problem, and it would do that only if the court had not already reserved a ruling on the motion. When given a choice we will interpret a court's actions and words to be logical instead of illogical.

For these reasons, the additional evidence the government put in may be considered in determining whether there was sufficient evidence of venue, and in light of that evidence there clearly was.

**AFFIRMED**.