[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 3, 2007
THOMAS K. KAHN
CLERK

_____

Nos. 06-10088

_____

D. C. Docket No. 05-00154-CR-6

UNITED STATES OF AMERICA,

Plaintiff-Appellee,
Cross-Appellant,

versus

JOHN WINDELL CLAY,

Defendant-Appellant,
Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Alabama

_____

**(April 3, 2007)**

Before CARNES, PRYOR and FARRIS,[*] Circuit Judges.

_____

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

PRYOR, Circuit Judge:

The main question presented in these cross-appeals is the contention of the government that John Windell Clay's 60-month sentence for possessing methamphetamine precursors is unreasonably lenient, when the advisory Guidelines range was 188 to 235 months and the variance was based primarily on Clay's postoffense rehabilitation. Several witnesses, including drug counselors and corrections workers, testified at Clay's sentencing hearing that Clay's rehabilitation was extraordinary, and the district court credited their testimony. In his appeal, Clay argues that the district court erred when it denied his motion to suppress evidence and when it enhanced his sentence based on acquitted conduct. We affirm Clay's conviction and sentence.

## I. BACKGROUND

On October 10, 2004, Sergeant James Eissler stopped Clay's car because only one headlight was operating. While Clay looked for his insurance card, Sergeant Eissler saw a shotgun between the driver's seat and the door. Sergeant Eissler asked Clay to get out of the car and conducted a pat-down search of Clay's person before placing him in the squad car.

Sergeant Eissler's search of Clay's pants pocket revealed an empty barrel from a ball-point pen, which is often used as a device for ingesting narcotics.

Sergeant Eissler removed the item from Clay's pocket because he could not tell by feel whether it was a weapon; he thought it might be a screwdriver. Sergeant Eissler advised Clay of his <u>Miranda</u> rights.

Clay, who did not appear impaired, consented to a search of his car. Sergeant Eissler left the window of the squad car open so that Clay could stop the search at any time. Sergeant Eissler discovered in the trunk of the vehicle ten unopened boxes of cold and allergy medication containing pseudoephedrine and arrested Clay. At the police station, after waiving his <u>Miranda</u> rights, Clay told police that he had purchased the pseudoephedrine pills for a man he occasionally supplied with such pills and admitted involvement with methamphetamine manufacturing and distribution.

Six months later, Clay was indicted with five others on charges of conspiracy to manufacture and possess with intent to distribute more than 500 grams of methamphetamine, 21 U.S.C. §§ 846, 841(a)(1), and possession of pseudoephedrine with reasonable cause to believe that it would be used to manufacture a controlled substance, <u>id.</u> § 841(c)(2). Before trial, Clay moved to suppress the evidence seized from his car and his statements to the police on October 10, 2004. The district court denied the motions, on the ground that the search of Clay's car was reasonable and his statements were voluntary.

At trial, the government presented evidence, including testimony by the five cooperating codefendants, that Clay had been involved in the manufacture of methamphetamine since 2000. Clay would supply manufacturers with precursor chemicals and supplies in exchange for methamphetamine. By 2004, Clay was participating directly in the manufacture and helped to produce about an ounce of methamphetamine two or three times a week for three to five months. The jury acquitted Clay of the conspiracy charges and convicted him of possession of pseudoephedrine.

Under the advisory Sentencing Guidelines, the base offense level for the offense of conviction was 22. United States Sentencing Guidelines § 2D1.11(d)(9) (Nov. 2005). At sentencing, the court found by a preponderance of the evidence that Clay was responsible for the manufacture of at least 1.5 kilograms of methamphetamine, which enhanced the offense level to 34. Id. §§ 1B1.3(a), 2D1.1(c)(3). The district court also found that Clay possessed a firearm during the offense, which enhanced the offense level by 2 levels. Id. § 2D1.11(b)(1). Clay's criminal history category was I, and the advisory sentencing range was 188 to 235 months' imprisonment.

At the sentencing hearing, eight witnesses testified about the religious conversion and life changes that Clay had experienced before his arrest in October

4

2004 and continuing until his conviction in August 2005. A leader of Clay's drug and alcohol rehabilitation program, Alan Cobb, testified that Clay was rehabilitated, obtained employment, and was a good employee. Another program leader, who worked in corrections, testified that Clay was living a "different life" since his involvement in the program. A minister at Clay's church who had worked in corrections for ten years testified that he had "seen a lot of inmates, so to speak, play a game" but the change in Clay's life was real. John and Rachael Leno had met Clay through the rehabilitation program and testified that they had overcome their drug addictions because of Clay's example and encouragement. Clay and his family members testified that, following his conversion, Clay had stopped using drugs and alcohol, rededicated himself to his family, and began regularly attending rehabilitation meetings and visiting a juvenile detention center.

The court found that Clay's postoffense rehabilitation was extraordinary:

> Well, I have considered the statutory purposes of sentencing in this case and I have considered the sentencing guidelines. I am sentencing under the guidelines scheme. But I find, Mr. Clay, that in your case a downward departure for post-offense rehabilitation is appropriate.
> But I also agree with [the government] that one of the primary purposes of sentencing as set out in 3553 is punishment. And I have to take into account the fact that, although your motivation for participation in the manufacture of methamphetamine was so that you could use it, the others who were participating in it with you were also doing it and providing it at the same time as to you to many other

5

people, and your help in that manufacture was in essence helping other people get hooked on drugs themselves. And I can't just ignore that.

Your guidelines, the low end of them, is 188 months. That's in excess of 15 years. I'm going to give you a substantial reduction, and you and your family still will think that it is too long to spend in jail. But it is a more substantial reduction than I have given to anybody for this reason that I'm going to give it to you.

I do believe that your change is real. And with God's help, you will continue on the same path that you are currently on.

The court imposed a sentence of 60 months' imprisonment. Clay appealed, and the government cross-appealed.

## II. STANDARDS OF REVIEW

Several different standards of review govern this appeal. We review under a mixed standard of review the denial of a motion to suppress, United States v. Zapata, 180 F.3d 1237, 1240 (11th Cir. 1999), and the application of the Sentencing Guidelines, United States v. Miranda, 348 F.3d 1322, 1330 (11th Cir. 2003). In reviewing Clay's sentence, we review the factual findings of the district court for clear error and the application of the law to the facts de novo. Id. We review de novo whether a sentencing factor is impermissible. United States v. Williams, 456 F.3d 1353, 1361 (11th Cir. 2006), petition for cert. filed (U.S. Oct. 19, 2006) (No. 06-7352). We review a sentence for reasonableness. Id. at 1363. Our review for reasonableness is deferential, and the party challenging the

6

sentence has the burden of establishing unreasonableness. <u>United States v. Talley</u>, 431 F.3d 784, 788 (11th Cir. 2005). "The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court," but "we will remand for resentencing if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." <u>Williams</u>, 456 F.3d at 1363.

## III. DISCUSSION

We must first review Clay's appeal and then the cross-appeal by the government. Clay argues that the district court erred when it denied his motion to suppress the evidence seized from his car and when it enhanced his sentence based on acquitted conduct. The government argues that Clay's sentence was unreasonable. We discuss each issue in turn and conclude that the district court committed no reversible error.

### A. Clay's Motion to Suppress Was Properly Denied.

Clay argues that the boxes of pseudoephedrine pills seized from the trunk of his car should have been suppressed because they were the fruit of an unreasonable search, but we disagree. Sergeant Eissler obtained reasonable

7

suspicion to conduct a pat-down search of Clay's person when he saw the shotgun in plain view, which created reason to believe that he was "dealing with an armed and dangerous individual." Terry v. Ohio, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968). This case is unlike Minnesota v. Dickerson, 508 U.S. 366, 378, 113 S. Ct. 2130, 2138-39 (1993), in which a Terry search was held unreasonable when it extended to a pocket that the officer believed contained drugs. Sergeant Eissler continued his search only because he thought the long, thin object in Clay's pocket might be a screwdriver or something similar that could be used as a weapon.

We join our sister circuits in affirming that a Terry search may continue when an officer feels a concealed object that he reasonably believes may be a weapon. See, e.g., United States v. Hartz, 458 F.3d 1011, 1018 (9th Cir. 2006); United States v. Hanlon, 401 F.3d 926, 930 (8th Cir. 2005); United States v. Holmes, 385 F.3d 786, 789-91 (D.C. Cir. 2004); United States v. Majors, 328 F.3d 791, 795 (5th Cir. 2003); United States v. Harris, 313 F.3d 1228, 1237-38 (10th Cir. 2002); United States v. Rahman, 189 F.3d 88, 120 (2d Cir. 1999); United States v. Swann, 149 F.3d 271, 275-77 (4th Cir. 1998). Under Terry, a search does not exceed "that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby" if the officer has an objective, reasonable belief that "his safety or that of others is in danger." Terry, 392 U.S. at

8

26-27, 88 S. Ct. at 1882-83. Sergeant Eissler was entitled to ensure his safety by searching Clay's pocket after his initial pat-down supplied reason to believe that the item concealed therein might be a weapon.

We find no basis for Clay's contention that the search of the trunk of his car was unreasonable. Clay gave voluntary consent to the search of the trunk and does not argue that his consent was involuntary or invalid. Reasonable detention during a Terry search is proper, see Michigan v. Long, 463 U.S. 1032, 1051, 103 S. Ct. 3469, 3482 (1983), and Clay does not argue that his detention was unreasonable or rendered his consent involuntary. Because Clay consented to the search that led to the discovery of the pseudoephedrine pills, that search was not unreasonable and Clay's motion to suppress was properly denied.

### B. The District Court Did Not Err When It Used Acquitted Conduct to Enhance Clay's Sentence.

Clay argues that the involvement of 1.5 kilograms of methamphetamine, of which the jury acquitted him, was not proved by a preponderance of the evidence, but again we disagree. Clay argues that the trial testimony that established the quantity of drugs was incredible and inconsistent, but "[w]e afford substantial deference to the factfinder, in this case, the district court, in reaching credibility determinations with respect to witness testimony." United States v. Pham, 463

9

F.3d 1239, 1244 (11th Cir. 2006) (internal quotation marks omitted). The testimony of Clay's co-conspirators was largely consistent, and it was corroborated by Clay's own admissions. In the absence of any record evidence that undermines this finding by the district court, we cannot say the district court clearly erred.

Clay also erroneously argues that the acquitted conduct enhancement increased his sentence so much as to violate due process. The Supreme Court has hinted at the possibility of this problem, see United States v. Watts, 519 U.S. 148, 156-57, 117 S. Ct. 633, 637-38 (1997), but has never identified a case in which those extreme circumstances exist, and neither has this Court. We are convinced that this Guidelines enhancement is not extraordinary. Clay did not face a mandatory-minimum life sentence, cf. United States v. Lombard, 72 F.3d 170, 177, 186 (1st Cir. 1995), or a twelve-fold increase in his sentence, cf. United States v. Kikumura, 918 F.2d 1084, 1100-01 (3d Cir. 1990). Clay's enhancement raised the bottom of the Guidelines range by a factor of 3.7 and the top of the range was still less than the 20-year maximum authorized by the jury verdict, see 21 U.S.C. § 841(c). The enhancement did not violate due process.

*C. Clay's Sentence Was Not Unreasonable.*

In its cross-appeal, the government argues that Clay's 60-month sentence, which was less than one-third of the low end of the Guidelines range, was unreasonable for these reasons. The government contends that Clay's religion is an impermissible factor, the district court gave too much weight to postoffense rehabilitation and insufficient weight to the other sentencing factors, and the district court did not adequately explain the substantial variance. Each argument fails, as we discuss in turn.

First, the district court did not rely on religion as a sentencing factor. Religion is an impermissible factor, U.S.S.G. § 5H1.10, and a sentence can be unreasonable, regardless of length, if it was substantially affected by the consideration of impermissible factors, Williams, 456 F.3d at 1361. The district court did not consider Clay's religious belief; the court credited testimony at the sentencing hearing about changes in Clay's life that followed his religious conversion. These considerations of postoffense rehabilitation are appropriate when a district court evaluates the history and characteristics of the defendant and the need to protect the public from further crimes of the defendant. See 18 U.S.C. § 3553(a)(1), (a)(2)(C).

Second, we do not believe the district court abused its discretion when it weighed the sentencing factors of section 3553(a). The government argues that the court relied too heavily on postoffense rehabilitation in fashioning Clay's sentence, but the district court observed that the sentencing factors cut both ways for Clay. Although his history and the circumstances of his rehabilitation suggested that a sentence below the Guidelines range was appropriate, the seriousness of Clay's offense and the need for just punishment required a sentence much longer than Clay had urged. The government argues about sentencing disparities among Clay's codefendants, but that argument is irrelevant because none of the codefendants had yet been sentenced at the time of Clay's hearing. The codefendants have since received terms of 35, 36, 48, and 60 months after being convicted of the conspiracy offense, and the leader of the conspiracy received a 146-month sentence. If Clay's sentence were unreasonably disparate, we would expect it to be considerably lower than those of the codefendants more culpable than Clay but less culpable than the organizer.

Finally, we conclude that Clay's 60-month sentence was reasonable. One of the purposes of our sentencing system is to impose "the punishment that most effectively lessens the likelihood of future crime, either by deterring others or incapacitating the defendant." U.S.S.G. ch. 1, pt. A, introductory cmt. 3. Both the

Guidelines calculations and the sentencing factors of section 3553(a) require a judge to consider characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend.

This record reflects that the sentencing judge engaged in precisely this kind of objective risk assessment and then entered a sentence "sufficient but not greater than necessary" to satisfy the purposes of section 3553(a). The enhancements for the firearm and the acquitted conduct reflect that, unlike some other defendants who possess ten boxes of cold medicine, Clay had been involved in the drug trade for years, was armed during the offense, and required longer incapacitation to protect the community and provide just punishment. The departure for postoffense rehabilitation reflects that, unlike some other defendants, Clay has fundamentally changed since his offense, poses a lesser risk to the community, and does not require incapacitation for too long.

Clay observes that his sentence is within the advisory Guidelines range (51 to 63 months) that would have applied without the enhancement for acquitted conduct, but this observation attempts to prove too much. It would have been unreasonable for the district court to ignore a finding of responsibility for acquitted conduct under the Guidelines, and nothing in the record suggests that the district court fashioned the sentence to avoid taking acquitted conduct into

13

account. The district court found by a preponderance that Clay committed these offenses, and the district court correctly calculated Clay's enhanced range under the Guidelines.

"[W]hen imposing a sentence falling far outside of the Guidelines range, based on the § 3553(a) factors, an extraordinary reduction must be supported by extraordinary circumstances." United States v. McVay, 447 F.3d 1348, 1357 (11th Cir. 2006) (internal quotation marks omitted). This record presents extraordinary circumstances. According to the district judge, those circumstances compelled the largest variance for postoffense rehabilitation that she had ever given.

It is true that some of Clay's postoffense behavior was not extraordinary. Among the conditions of Clay's pretrial release were maintaining or actively seeking employment, refraining from use or possession of controlled substances, and participating in substance abuse treatment. If Clay had not attended a drug program, stayed clean, and found a job, his bail could have been revoked.

But Clay went beyond minimal compliance with his bail conditions. Clay's former employer testified that Clay worked a second job for him on the weekends, and stated that he would hire him again "tomorrow" if he could. The Lenos testified that, beyond merely attending drug counseling meetings, Clay invited

14

fellow addicts into his home and inspired them to overcome their addictions through his example. On his own initiative, Clay also visited a juvenile detention center regularly for over a year and encouraged young people to change their lives. The confidence of people who did not know Clay before his arrest—people who had nothing to gain by lying about his transformation and plenty to lose if his transformation was phony—helps to demonstrate the extraordinariness of Clay's rehabilitation.

Clay's family, his lawyer, and witnesses who worked in corrections emphasized that Clay's experience was not a "jailhouse conversion." Six months elapsed between Clay's arrest for misdemeanor possession and his indictment on federal charges. That the changes in Clay's life occurred before Clay had any inkling that he would face a prison sentence further evidences that the measure of his rehabilitation was extraordinary.

We defer to the finding of the sentencing judge that the testimony about Clay's rehabilitation was credible, see Pham, 463 F.3d at 1244, and the sentencing judge's exercise of discretion based on that finding. The district court was not required, of course, to believe any of the evidence of Clay's rehabilitation, and we are not holding that a district court must vary downward in sentencing when it finds that there has been postoffense rehabilitation. When we review a decision of

15

a district court for abuse of discretion, there are some cases where we will affirm the district court whichever way it decided the matter. See, e.g., United States v. Kelly, 888 F.2d 732, 745 (11th Cir. 1989) ("The abuse of discretion standard has been described as allowing a range of choice for the district court, so long as that choice does not constitute a clear error of judgment."); In re Rasbury, 24 F.3d 159, 168 (11th Cir. 1994) ("[U]nder the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call.").

The government argues that the district court should have provided a more thorough analysis of the sentencing factors, but we have not required district courts to discuss each factor exhaustively. United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005). The analysis of the district court provides enough reasoning for us to review meaningfully, and we are not "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Williams, 456 F.3d at 1363.

## IV.  CONCLUSION

Clay's conviction and sentence are

**AFFIRMED.**