[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16946
Non-Argument Calendar
_____

D.C. Docket No. 4:16-cr-10004-JLK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MAIKEL SUAREZ PLASENCIA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(April 11, 2018)

Before TJOFLAT, WILLIAM PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

Maikel Suarez Plasencia ("Suarez") appeals his convictions and fifty-one-month concurrent sentences for encouraging and inducing aliens to enter the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv), (v)(II).  He contends that his convictions were based on evidence obtained from an unconstitutional search of his global positioning system ("GPS"), which linked him to the illegal entry of Cuban migrants, and that his sentence reflects an obstruction-of-justice enhancement applied contrary to his due process rights and against the merits.  *See* U.S.S.G. § 3C1.1.  After careful review, we affirm Suarez's convictions and sentence.

I.

On the morning of September 6, 2015, twenty-eight Cuban migrants were found on Loggerhead Key, Florida.  Later that day, Suarez's boat broke down on Garden Key, an island three miles east of Loggerhead Key and seventy miles west of Key West.  A park ranger, David Fuellner, responded to a report of Suarez's beached boat and located Suarez and the boat.[1]  Fuellner asked Suarez for permission to search his boat, and Suarez consented orally and by signing a

---

[1] According to the Government, the report relayed that "a Spanish-speaking man had told a park supervisor that he had been camping and fishing for the previous two days, that he needed fuel for his boat, and that he needed to get . . . to Key West to get somebody to come back and bring him fuel."

2

consent form.[2]  The signed form authorized Fuellner to perform a "complete"

search of the vessel and to seize its contents for any "legitimate law enforcement

purpose."  Suarez then took a ferry to Key West to summon help with fixing his

boat.

Fuellner conducted the search the next day and found a GPS which, once

plugged into the boat's power source and turned on, showed a waypoint indicating

that the boat had been just off of Cuba's shore on September 5, 2015.[3]  Fuellner

then powered off the GPS, seized it, and entered it into evidence.  Later analysis of

the GPS, performed by a Coast Guard analyst, revealed that Suarez left Key West

around 1:30am on September 5, arrived off the coast of Cuba at about 4:30pm that

day, and then reached the vicinity of Loggerhead and Garden Keys in the early

morning of September 6.  The trip from Cuba to the United States took about ten

hours.  No warrant was obtained for Fuellner's search or for this analysis.

Department of Homeland Security ("DHS") agents interviewed Suarez on

September 8.  Suarez claimed that he had taken his boat on a spear-fishing trip

from Key West to the Dry Tortugas[4] and that he spent a night on the vessel.  He

denied knowledge of a migrant landing in the area.  Months later, DHS agents

---

[2] Fuellner spoke in Spanish, Suarez's native language.  Also, the consent form provided to Suarez was written in Spanish.

[3] Fuellner's search yielded no camping equipment, operational fishing gear, extra clothing, or bait.

[4] Loggerhead Key and Garden Key are both within the Dry Tortugas.

3

again interviewed Suarez.  When they confronted Suarez with the GPS evidence linking him to the Cuban shore, he claimed that the agents had mixed up his GPS with someone else's.  However, Suarez admitted that his wife and two of his children were among the migrants who landed on September 6, 2015.

On March 11, 2016,  a federal grand jury sitting in the Southern District of Florida returned a twenty-eight-count indictment against Suarez, charging him with alien smuggling, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv), (v)(II).  Suarez filed a motion on June 8, 2016 to suppress the GPS evidence.  The District Court denied the motion on two grounds.  First, it held that by consenting to a search of his vessel without limitation, Suarez consented to a search of his GPS found onboard.  Next, and in the alternative, the Court held that Suarez had abandoned the boat and its contents by leaving it on a public shore for "three to four days" before returning to fix it.

Suarez's case continued on to a jury trial, where Suarez presented as witnesses eight of the Cuban migrants found on September 6, 2015.  The migrants testified generally that a "raft" with a single engine brought them from Cuba to the United States, that the trip took two nights and one day, that the raft was destroyed or lost, and that they waded to the United States shore from between fifteen and seventy-five feet out in the ocean.  All of the migrant witnesses denied that Suarez assisted their journey in any way.  The Government's witnesses testified that no

4

raft, or debris from a destroyed raft, was found and that the ocean's depth even fifteen feet from the shore at which the migrants claimed to have landed would have made wading impossible.  The Government also presented testimony that the migrants did not appear hungry, dehydrated, disheveled, or wet—conditions typical of migrants who come from Cuba to the United States by raft.  The jury found Suarez guilty of all twenty-eight counts of alien smuggling.

A presentence investigation report ("PSI") of Suarez was then issued.  It set the Guidelines range of Suarez's sentence at thirty-three to forty-one months, which accounted for a two-point reckless-endangerment enhancement under U.S.S.G. § 2L1.1(b)(6).  The PSI did not recommend a U.S.S.G. § 3C1.1 enhancement for obstruction of justice, stating, "The probation officer has no information indicating the defendant impeded or obstructed justice."

The Government did not object to the PSI for failing to recommend a sentencing enhancement for obstruction of justice, but it filed notice of its intent to seek an upward variance in Suarez's sentence due in part to the "full day's worth of conflicting, sworn testimony" Suarez presented at trial.  Suarez did not respond to the Government's notice, citing a lack of time to do so as the reason.

At sentencing, the District Court applied U.S.S.G. § 2L1.1(b)(6)'s reckless-endangerment enhancement and then, *sua sponte*, added two more points to Suarez's total offense level under U.S.S.G. § 3C1.1 for knowingly suborning

perjury at trial.  The Court noted that Suarez knew from his counsel's opening statement that numerous witnesses would lie on his behalf but Suarez nonetheless allowed them to testify.[5]  This obstruction-of-justice enhancement increased the Guidelines range of Suarez's sentence to forty-one to fifty-one months.  After relaying its decision to impose the enhancement, the Court stated that it "assume[s] that [defense counsel] makes an objection to the Court's analysis."  Defense counsel confirmed that he objected, and the Court stated,

> So the record is clear.  Defense counsel . . . has made a valid objection
> to all of this and objects to the Court's finding and he's fully protected
> to raise this on appeal.  I think that protects the defendant.  Do you
> have anything else?  That's the finding.

The Court then heard arguments from the Government and defense counsel about whether the Court should vary from the applicable Guidelines range.  The Government requested that Suarez receive sixty months' imprisonment, citing the seriousness of Suarez's offenses and the disrespect to the court that he promoted by presenting false testimony from numerous witnesses.  Defense counsel then argued that Suarez deserved only fifteen months' imprisonment because, namely, the migrants Suarez smuggled into the United States were his friends and family and

---

[5] Specifically, in his opening statement defense counsel announced to the jury,

> But what you're not going to hear from the government is the migrants.  You're
> gonna hear that from the defense.  You're gonna have the ability to look at the
> migrants, in that chair, and judge, hear what they say, hear them say that they
> didn't encounter [Suarez] out at sea; that he did not render aid, assist, or help
> them, in any way, get here to the United States.

he did not bring them over for profit.  Defense counsel made no argument

regarding Suarez's subornation of perjury.  The Court then denied the

Government's request for an upward variance and imposed a sentence of fifty-one

months' imprisonment and three years' supervised release.  Suarez appealed his

convictions and sentence.

On appeal, Suarez first argues that the District Court erred in denying his

motion to suppress evidence recovered from the search of his GPS.  He contends

that the consent he provided to Fuellner did not include consent to search his GPS

and that he did not abandon his boat.[6]  Next, Suarez makes two challenges to the

District Court's decision to apply U.S.S.G. § 3C1.1's two-point obstruction-of-

justice enhancement.  First, he asserts that the Court violated his due process rights

by applying the enhancement *sua sponte*, without offering him prior notice or an

opportunity to argue against the enhancement.  Second, he claims that the Court

erred on the merits because he did not knowingly present perjured testimony.  We

start with the District Court's denial of Suarez's motion to suppress.

II.

When considering a district court's ruling on a motion to suppress, we

review factual findings for clear error and application of law to the facts *de novo*.

*United States v. Ramos*, 12 F.3d 1019, 1022 (11th Cir. 1994).  Clear error lies only

---

[6] Because we conclude that the scope of Suarez's consent included the search and later analysis of his GPS, we do not review the Court's abandonment determination.

where the record leaves us "with the definite and firm conviction that a mistake has been committed." *United States v. White*, 335 F.3d 1314, 1319 (11th Cir. 2003) (internal quotation marks omitted). Moreover, we construe all facts in the light most favorable to the party who prevailed below. *United States v. Bervaldi*, 226 F.3d 1256, 1262 (11th Cir. 2000).

"The Fourth Amendment protects the people against 'unreasonable' searches and seizures. A consensual search is manifestly reasonable so long as it remains within the scope of the consent." *United States v. Martinez*, 949 F.2d 1117, 1119 (11th Cir. 1992). Whether limitations were placed on the scope of consent, and whether the search conformed to those limitations, is a question of fact determined by the totality of the circumstances. *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989). The Government bears the burden of showing that its search was conducted within the scope of the consent received. *Id.* at 799–800. "When an individual gives a general statement of consent without express limitations," the scope "is constrained by the bounds of reasonableness: what a [law enforcement] officer could reasonably interpret the consent to encompass." *Martinez*, 949 F.2d at 1119.

Our decision in *United States v. Street*, a case analogous to Suarez's, is instructive. *See* 472 F.3d 1298 (11th Cir. 2006). There, the defendant consented to a "complete search" of his residence and to seizure of "any items" related to a

8

string of recent bank robberies. *Id.* at 1308. Law enforcement found a police radio on a bedroom floor, turned it on, and noticed that it was tuned to a radio zone covering where a robbery had occurred earlier. *Id.* at 1303. Because the radio was in plain view and the defendant did not limit the search, we concluded that law enforcement could reasonably believe that the radio was within the scope of the consent provided. *Id.* at 1308–09.

Here, via signed consent form, Suarez consented to a "complete" search of his boat and to seizure of its contents for any "legitimate law enforcement purpose." He did not limit the scope of his consent in any way. *Cf. United States v. Rich*, 992 F.2d 502, 507 (5th Cir. 1993) ("[The defendant], knowing the contents of [his] vehicle and its various containers at the time he gave his consent, had the responsibility to limit the scope of the consent if he deemed it necessary to do so."). Fuellner found the GPS in one of the boat's storage compartments, lying beneath some other items. Suarez's consent clearly covered the compartment where the GPS was found, despite Suarez's argument to the contrary. *See United States v. Strickland*, 902 F.2d 937, 942 (11th Cir. 1990) (holding that an officer's search of a spare-tire compartment was within the scope of the defendant's consent to a search of his "entire vehicle").

Suarez further argues that Fuellner exceeded the scope of Suarez's consent by powering up the GPS, which was off when Fuellner found it. *Street*, however,

guides the other way. *See* 472 F.3d at 1308–09. Moreover, in determining the scope of a search, we consider "what the parties knew at the time to be the object of the search." *Martinez*, 949 F.2d at 1119. Suarez's boat was beached seventy miles from Key West's shore. A reasonable person would understand that giving "complete" consent to a search of his boat, in this context, would include consenting to the search of a GPS on board that could indicate where the boat had been and shed light on why it is beached so far out in the ocean. This is especially so given that the consent form indicated that law enforcement was looking generally for items that could be used for any legitimate law enforcement purpose. Conversely, an officer receiving unbounded consent in this situation could reasonably believe that the consent covered a search of the GPS. Fuellner therefore did not violate Suarez's Fourth Amendment rights by searching the GPS. And, for the same reasons, nor did the Coast Guard analyst in performing a forensic analysis of the GPS. Accordingly, the District Court did not err in denying Suarez's motion to suppress.

## III.

Suarez next argues that the District Court's application of U.S.S.G. § 3C1.1's two-point enhancement was both in violation of his due process rights and incorrect on the merits. When reviewing a district court's decision to apply an enhancement under § 3C1.1, we review factual findings for clear error and the

district court's application of the Guidelines to those facts *de novo*. *United States v. Bradberry*, 466 F.3d 1249, 1253 (11th Cir. 2006). In reviewing the district court's findings of fact, we provide "substantial deference" to the court's credibility determinations at sentencing. *United States v. Clay*, 483 F.3d 739, 744 (11th Cir. 2007).

### A.

Suarez contends that the District Court violated his due process rights by imposing the § 3C1.1 enhancement *sua sponte*, without providing him adequate notice or an opportunity to be heard on the issue. We disagree.

Due process requires that a criminal defendant have adequate notice of, and an opportunity to contest, the facts used to support his criminal penalty. *United States v. Jules*, 595 F.3d 1239, 1243 (11th Cir. 2010). But "sentencing procedures are not required to be as exacting as those at trial." *Id.* The defendant's primary due process interest at sentencing is the "right not to be sentenced on the basis of invalid premises or inaccurate information." *See id.* Hence, the degree of due process protection required at sentencing is only that which is necessary "to ensure that the district court is sufficiently informed to enable it to exercise its sentencing discretion in an enlightened manner." *United States v. Stephens*, 699 F.2d 534, 537 (11th Cir. 1983).

Federal Rule of Criminal Procedure 32 governs, *inter alia*, the issuance of PSIs. Rule 32(d) requires that a PSI "identify all applicable guidelines" and "any factor relevant to . . . the appropriate kind of sentence." But district courts are not bound by the facts and recommendations set forth in a PSI; they may choose not to adopt the facts as recited in the report or not to apply the Guidelines in the proposed manner. *United States v. Jones*, 899 F.2d 1097, 1102 (11th Cir. 1990), *overruled in part on other grounds*, *United States v. Morrill*, 984 F.2d 1136 (11th Cir. 1993) (en banc); *see United States v. Aguilar-Ibarra*, 740 F.3d 587, 591 (11th Cir. 2014) (noting that district courts have an obligation independent of the PSI to correctly calculate the defendant's Guidelines range). It follows that, with proper notice, a court may apply Guidelines enhancements not identified in the PSI.[7]

Here, defense counsel's opening statement indicated that the migrant witnesses would deny Suarez's involvement in their illegal entry into the United States. Then, Suarez sat idly as the witnesses told a similar story contradicting the record. This put Suarez on notice that the witnesses' apparently false testimony, and his own inaction, might later be cited by the Government or the Court as a reason for lengthening his sentence. Indeed, before Suarez's sentencing hearing, the Government provided notice that it intended to seek an upward variance in part

---

[7] It also follows that the Government's failure to object to the PSI for failing to recommend an applicable enhancement—here, § 3C1.1—does not preclude a district court from applying that enhancement.

because of the witnesses' perjured testimony.  Suarez thus cannot claim that he lacked adequate notice of the conduct underlying the Court's *sua sponte* decision to apply § 3C1.1's obstruction-of-justice enhancement.

The Guidelines, moreover, "define specific and finite factors warranting the application of an upward or downward adjustment to a defendant's otherwise applicable sentencing range."  *United States v. Canada*, 960 F.2d 263, 266 (1st Cir. 1992).  Therefore, when, as here, the circumstances afford a defendant notice that he engaged in conduct that may result in the application of a Guidelines enhancement, the court need not provide additional notice of its intention to apply the enhancement *sua sponte*—the Guidelines themselves provide adequate notice.[8]

Further supporting this conclusion are the Supreme Court's decisions in *Burns v. United States*, 501 U.S. 129, 111 S. Ct. 2182 (1991), and *Irizarry v. United States*, 553 U.S. 708, 128 S. Ct. 2198 (2008).  In *Burns*, the Court held that

---

[8] *See United States v. Sharp*, 436 F.3d 730, 738 (7th Cir. 2006) (stating that the defendant's awareness of his own false testimony put him "on notice that [his testimony] could result in a possible obstruction of justice enhancement"); *United States v. Knight*, 76 F.3d 86, 88 (5th Cir. 1996) ("[I]f the defendant has actual knowledge of the facts on which the district court bases an enhancement or a denial of a reduction, the Sentencing Guidelines themselves provide notice of the grounds relevant to the proceeding."); *United States v. Willis*, 997 F.2d 407, 416–17 (8th Cir. 1993) (affirming a district court's *sua sponte* imposition of an obstruction-of-justice enhancement, despite the PSI stating that the probation officer had "no information" regarding obstruction of justice, because the defendant was on notice that his perjured statements at trial might result in the enhancement); *Canada*, 960 F.2d at 266–67 (noting that even where a PSI states there is "no basis" for a particular sentencing enhancement, "the guidelines themselves provide notice to the defendant" that "he may be called upon to comment" on the enhancement); *United States v. Rucker*, 122 F.3d 1064 (4th Cir. 1997) (unpublished table decision) (holding that a defendant is not entitled to "advance notice of sua sponte adjustments to the guideline calculation, at least where the facts relevant to the adjustment are known to the defendant, because the bases for adjustments are limited and are set out in the guidelines").

before a district court may issue an upward departure from the Guidelines, notice must be given in the PSI, in a prehearing submission by the Government, or by the district court itself. *Burns*, 501 U.S. at 138, 111 S. Ct. at 2187. Unlike with enhancements, "the Guidelines place essentially no limit on the number of potential factors that may warrant a departure." *Id.* at 136, 111 S. Ct. at 2186. Hence, notice is more important for defendants to prepare an argument against a departure than to prepare one against an enhancement.

In *Irizarry*, the Court then abrogated its holding in *Burns* by deciding that notice, although necessary for a court to issue an upward departure,[9] is not necessary for a court to issue an upward *variance*. 553 U.S. at 716, 128 S. Ct. at 2203. It noted that because *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), rendered the Guidelines advisory, there was no longer an "expectation subject to due process protection . . . that a criminal defendant would receive a sentence within the presumptively applicable Guidelines range." *Irizarry*, 553 U.S. at 713, 128 S. Ct. at 2202. Given that defendants are not entitled to notice of variances—and that Guidelines enhancements, unlike departures, are finite and

---

[9] The *Irizarry* Court specified that "'[d]eparture' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines." 553 U.S. at 714, 128 S. Ct. at 2202. The only departures relevant in *Burns* "were those authorized by 18 U.S.C. § 3553(b) (1988 ed.), which required 'an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *Irizarry*, 553 U.S. at 714, 128 S. Ct. at 2202 (quoting *Burns*, 501 U.S. at 141, 111 S. Ct. at 2189 (Souter, J., dissenting)).

specific—Suarez, who had notice of § 3C1.1 and of his witnesses' conduct at trial, was not denied due process when the District Court applied § 3C1.1 *sua sponte*.

Suarez contends that a new sentencing hearing is nonetheless warranted because the District Court failed to allow his counsel to comment on the § 3C1.1 enhancement. *See United States v. Mylor*, 971 F.2d 706, 707 (11th Cir. 1992) (holding that the district court erred by refusing to hear argument by the defense concerning a Guidelines enhancement).[10]  Although the District Court noticed a defense objection to the § 3C1.1 enhancement counsel without explicitly stating the basis of the objection, it did ask counsel whether there was "anything else" regarding the enhancements it applied.  The Court then heard further argument from both parties regarding whether to deviate from the applicable Guidelines range in imposing Suarez's sentence.  The Government argued for an upward variance in part because of the defense witnesses' false testimony—even stating that the District Court "succinctly summed up" the basis for its argument when imposing the § 3C1.1 enhancement.  In his response, however, defense counsel did not attempt to counter the Government's argument or push back on the District Court's conclusion that Suarez suborned perjury.  The Court did not refuse to hear

---

[10] *See also* Fed. R. Crim. P. 32(i) (requiring courts to rule on any controverted matter at sentencing and give defense counsel an opportunity to speak on the defendant's behalf); U.S.S.G. § 6A1.3(a) ("When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor.").

argument from counsel related to Suarez obstructing justice; rather, counsel failed to argue the point.  A new sentencing hearing is therefore not warranted.[11]

B.

Suarez also contends that the District Court clearly erred in concluding that he suborned perjury and thus in applying § 3C1.1.  We find no clear error.

Section 3C1.1 applies if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." Covered conduct includes "committing, suborning, or attempting to suborn perjury."  U.S.S.G. § 3C1.1 cmt. n.4(B).  Under § 3C1.1, "the defendant is accountable for the defendant's own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused." U.S.S.G. § 3C1.1 cmt. n.9; *Bradberry*, 466 F.3d at 1254.

Knowingly procuring another to commit perjury constitutes subornation of perjury.  *Bradberry*, 466 F.3d at 1254.  Perjury, for purposes of § 3C1.1, is defined as giving "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty

---

[11] Courts should still strive to provide notice of their intention to impose previously unnoticed enhancements and allow adequate opportunity for parties to debate relevant sentencing issues.  As the *Irizarry* Court stated, "Sound practice dictates that judges in all cases should make sure that the [sentencing] information provided to the parties in advance of the hearing, and in the hearing itself, has given them an adequate opportunity to confront and debate the relevant issues."  553 U.S. at 715, 128 S. Ct. at 2203.

memory." *Id.* (quoting *United States v. Singh*, 291 F.3d 756, 763 (11th Cir. 2002)).  The Guidelines define material evidence as "evidence . . . that, if believed, would tend to influence or affect the issue under determination."  U.S.S.G. § 3C1.1 cmt. n.6.  Thus § 3C1.1's enhancement applies where a defendant knowingly calls a witness to testify on his behalf to produce false testimony tending to influence or affect the jury's verdict.  *See Bradberry*, 466 F.3d at 1254.

Suarez became aware of the migrant witnesses' potential testimony no later than during his counsel's opening argument, when counsel stated that the witnesses would deny that Suarez aided their entry into the United States in any way.  Then, spanning over more than a full day of trial, Suarez watched as each of the eight witnesses relayed a similar story denying his involvement and contradicting portions of the record.  This testimony, moreover, served as Suarez's primary evidence of innocence.  Under these circumstances, the District Court, which receives wide latitude in determining the credibility of evidence, *Clay*, 483 F.3d at 744, did not clearly err in concluding that Suarez knowingly suborned perjury, *cf. Bradberry*, 466 F.3d at 1254.

Finally, Suarez argues that because the Court applied § 3C1.1 *sua sponte* and without hearing from the Government, the Government could not have met its burden of proving the enhancement's applicability by a preponderance of the evidence.  *See United States v. Ndiaye*, 434 F.3d 1270, 1300 (11th Cir. 2006)

("The Government has the burden of proving the applicability of Guidelines that enhance a defendant's offense level.")  But a "district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial."  *Id.*  (quoting *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004)).  The Government presented testimony and other evidence at trial exposing the defense witnesses' perjury, and the District Court did not clearly err in crediting this evidence and determining that § 3C1.1 applied.  *See Clay*, 483 F.3d at 744.

## IV.

For the reasons discussed above, we affirm Suarez's convictions and sentence.

**AFFIRMED.**